# Effect of the Alienage Restriction in the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 on the Provision of Stafford Act Assistance in the Federated States of Micronesia and the Republic of the Marshall Islands

Congress did not intend the alienage restriction set forth in title IV of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 to apply extraterritorially. For this reason, the provision of Stafford Act assistance in the Federated States of Micronesia and the Republic of the Marshall Islands by the Federal Emergency Management Agency would not violate the PRWORA.

January 19, 2001

MEMORANDUM OPINION FOR THE GENERAL COUNSEL
FEDERAL EMERGENCY MANAGEMENT AGENCY

In the Compact of Free Association Act of 1985, Pub. L. No. 99-239, sec. 201, § 221, 99 Stat. 1770, 1800, 1816 (1986) (codified at 48 U.S.C. § 1901 note) ("Compact Act"),[*] the United States agreed to provide disaster relief to persons residing in the Federated States of Micronesia ("FSM") and the Republic of the Marshall Islands ("RMI") under the Robert T. Stafford Disaster Relief and Emergency Assistance Act, Pub. L. No. 93-288, 88 Stat. 143 (1974) (principally codified as amended at 42 U.S.C. §§ 5121-5201 (1994)). You have inquired whether the alienage restriction set forth in section 401 of title IV of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996, Pub. L. No. 104-193, 110 Stat. 2105, 2261 (codified as amended at 8 U.S.C. § 1611 (Supp. V 1999)) ("PRWORA" or "Act"), bars the provision of disaster relief by the Federal Emergency Management Agency ("FEMA") to persons residing in the FSM and RMI. We have concluded that the alienage restriction in the PRWORA does not apply to FEMA's provision of Stafford Act assistance in the FSM and RMI because the PRWORA's alienage restriction does not generally apply extraterritorially.

---

[*] Editor's Note: The Compact of Free Association with the Federated States of Micronesia and the Republic of the Marshall Islands (the "Compact") is distinct from the joint resolution in which Congress approved the Compact (the "Compact Act"). The Compact, with subdivisions of its own, is recorded in section 201 of the Compact Act, 99 Stat. at 1800-35. Thus, the reference in text is to section 221 of the Compact, as recorded in section 201 of the Compact Act. When this opinion cites the "Compact" with a section number, it refers to the Compact itself, as recorded in section 201 of the Compact Act. For ease of reference, the opinion provides parallel citations to the Statutes at Large, but to avoid repetition it does not each time provide a parallel citation to section 201 of the Compact Act or to 48 U.S.C. § 1901 note.

## I. Background

In enacting the Stafford Act, Congress intended "to provide an orderly and continuing means of assistance by the Federal Government to State and local governments in carrying out their responsibilities to alleviate the suffering and damage which result from . . . disasters." 42 U.S.C. § 5121(b). When the FSM and RMI became independent nations and were no longer Trust Territories of the Pacific Islands under the control of the United States, the United States and the FSM and RMI agreed to a Compact of Free Association ("Compact"). That Compact establishes a close relationship between the United States and the FSM and RMI. Congress passed a joint resolution in 1986 approving the Compact. Compact Act, § 101, 99 Stat. at 1773 (codified at 48 U.S.C. § 1901). Section 221(a)(2) of the Compact provides that the United States shall make available to the FSM and RMI the "services and related programs of . . . [*inter alia*] the United States Federal Emergency Management Agency," under the terms established in a separate agreement. 99 Stat. at 1816. That agreement provides that Stafford Act assistance

> shall be made available to the Marshall Islands or the Federated States of Micronesia in the same manner as assistance is made available to a "State." Solely for the purpose of applying the [Stafford Act] pursuant to this Article, the Marshall Islands or the Federated States of Micronesia shall be considered included within the definitions of "United States" and "State" as those terms are defined in 42 U.S.C. 5122.[1]

Federal Programs and Services Agreement Concluded Pursuant to Article II and Section 232 of the Compact of Free Association, art X, § 3, *reprinted in* H.R. Doc. No. 98-192, at 231 (1984) ("Program and Services Agreement"). The Section-by-Section Analysis for section 221 of the Compact explains that

> [w]hile the [FSM and RMI] will fund the basic functions of government from grant assistance and [local] revenues, performance of certain activities may be beyond the technical capability of the new governments at the outset of free association. Thus, the United States has agreed in Section 221(a) to continue to provide services of the United States Weather Service, the United States Federal Emergency Management Agency, the United States Postal Service, the Federal Aviation Administration and the Civil Aeronautics Board.

---

[1] Section 5122(4) of title 42 provides that "'State' means any State of the United States, the District of Columbia, Puerto Rico, the Virgin Islands, Guam, American Samoa, the Northern Mariana Islands, or the Trust Territory of the Pacific Islands."

Section-by-Section Analysis of the Compact of Free Association and Joint Resolution, H.R. Doc. No. 98-192, at 100 (1984). The Compact also states that the United States shall continue to provide the services and programs referred to in the Compact "unless their modification is provided by mutual agreement or their termination in whole or in part is requested by any recipient Government." Compact § 222(b), 99 Stat. at 1817. The terms of the Compact (as amended) provide that "[e]very citizen of the Marshall Islands or the Federated States of Micronesia who is not a resident of the United States shall enjoy the rights and remedies under the laws of the United States enjoyed by any non-resident alien."[2] Compact § 172(a), 99 Stat. at 1810. When Congress approved the Compact in 1986, it consented to the subsidiary agreements, including article X. Compact Act § 101(a)-(b), 99 Stat. at 1773 (codified at 48 U.S.C. § 1901(a)-(b)).

Your office has informed us that there are three Stafford Act programs administered by FEMA that could be subject to the alienage restriction in the PRWORA. Under the Disaster Housing Program, FEMA reimburses individuals for short-term lodging, helps restore homes to a livable condition, provides rental properties for victims, and makes mortgage or rental payments for individuals or families who, as a result of financial hardship caused by the disaster, face eviction or foreclosure. *See* 42 U.S.C. § 5174; Federal Emergency Management Agency, *Disaster Assistance: Section One* at 22 (Nov. 1995). Under the Individual and Family Grant program, FEMA makes cash grants to individuals and families for "disaster-related necessary expenses or serious needs." 42 U.S.C. § 5178(a); *accord* Federal Emergency Management Agency, *Disaster Assistance: Section One* at 23 (Nov. 1995). Finally, FEMA distributes food in conjunction with the Department of Agriculture's Food and Nutrition Service. *See* Federal Emergency Management Agency, *Programs and Activities in the Freely Associated States of the Republic of the Marshall Islands (RMI) and the Federated States of Micronesia (FSM)* at 2 (Feb. 14, 2000). The Department of Agriculture provides the funding to purchase food, and FEMA funds distribution of the food, administration of the program, and other related costs. *See id*.[3]

---

[2] In light of the conclusion we reach here, we need not resolve whether this provision of the Compact would entitle these individuals to benefits as "qualified aliens" under 8 U.S.C. § 1641(b). We do note that the term "non-resident alien" is not a defined term under United States immigration law.

[3] We understand that there is a fourth program that, at least as a theoretical matter, could be affected by the PRWORA. Under the Stafford Act, the Department of Agriculture oversees the Food Coupons and Distribution program, which provides food stamps and surplus commodities to families in need. *See* 42 U.S.C. § 5179. In the FSM and RMI, however, there is no food stamp program because the program "has never been implemented in those jurisdictions and no retail redemption system exists." Letter for Randolph D. Moss, Acting Assistant Attorney General, Office of Legal Counsel, from Charles R. Rawls, General Counsel, Department of Agriculture (Sept. 14, 1998). Similarly, there is no distribution of surplus provisions because the Department of Agriculture "has no ongoing programs in these countries." Federal Emergency Management Agency, *Programs and Activities in the Freely Associated States of the Republic of the Marshall Islands (RMI) and the Federated States of Microne-*

In 1996 Congress passed the PRWORA. In title IV of the Act, Congress set forth its purposes in a section entitled "Statements of national policy concerning welfare and immigration." 8 U.S.C. § 1601. Congress established that

> (1) [s]elf-sufficiency has been a basic principle of United States immigration law since this country's earliest immigration statutes.
>
> (2) It continues to be the immigration policy of the United States that—
>
> > (A) aliens within the Nation's borders not depend on public resources to meet their needs, but rather rely on their own capabilities or the resources of their families, their sponsors, and private organizations, and
> >
> > (B) the availability of public benefits not constitute an incentive for immigration to the United States.

8 U.S.C. § 1601(1)-(2) (Supp. V 1999). The remaining statements in section 1601 are related to these purposes. *See, e.g.*, *id*. § 1601(5) ("It is a compelling government interest to enact new rules for eligibility and sponsorship agreements in order to assure that aliens be self-reliant in accordance with national immigration policy.").

To give effect to these goals and policies, Congress restricted alien eligibility for federal benefits, providing that "[n]otwithstanding any other provision of law . . . an alien who is not a qualified alien . . . is not eligible for any Federal public benefit." 8 U.S.C. § 1611(a). In title IV, Congress incorporated the Immigration and Nationality Act's broad definition of an "alien" as "any person not a citizen or national of the United States." 8 U.S.C. § 1101(a)(3) (1994) (cited in 8 U.S.C. § 1641(a) (Supp. V 1999)). Although "qualified aliens" are eligible to receive specified federal public benefits within certain time frames, *see* 8 U.S.C. § 1612 (Supp. V. 1999), the definition of qualified aliens does not explicitly include citizens of the FSM and RMI. *See* 8 U.S.C. § 1641(b) (qualified aliens include, for example, legal permanent residents, asylees, refugees); *see also supra* note 2. Congress broadly defined federal public benefits to include

> (A) any grant, contract, loan, professional license, or commercial license provided by an agency of the United States or by appropriated funds of the United States; and

---

*sia (FSM)* at 2 (Feb. 14, 2000). Because this program has never been implemented in the FSM and RMI, we do not address it in this opinion.

(B) any retirement, welfare, health, disability, public or assisted housing, postsecondary education, food assistance, unemployment benefit, or any similar benefit for which payments or assistance are provided to an individual, household, or family eligibility unit by an agency of the United States or by appropriated funds of the United States.

8 U.S.C. § 1611(c)(1)(A)-(B).

With this legal framework in mind, we turn in more detail to the applicability of the alienage restriction to FEMA's provision of Stafford Act assistance in the FSM and RMI.

## II. Analysis

To determine whether the alienage restriction in title IV of the PRWORA is applicable to the provision of Stafford Act assistance in the FSM and RMI, the critical question to answer is whether the PRWORA's alienage restriction applies outside of the United States.[4] To answer this question, we examine both the text and the legislative history of title IV.[5] We conclude that the alienage restriction in title IV, in general, operates only within the United States. Because the FSM and

---

[4] It could be argued that the FSM and RMI are actually part of the United States for purposes of Stafford Act assistance and therefore the extraterritoriality question is not presented. The Program and Services Agreement provides that "[s]olely for the purpose of applying the [Stafford Act] pursuant to this Article, the Marshall Islands or the Federated States of Micronesia shall be considered included within the definitions of 'United States' and 'State' as those terms are defined in 42 U.S.C. 5122." Program and Services Agreement at 231. We found no support for reading this provision of the Program and Services Agreement to obviate the question of extraterritoriality. The best reading of this provision is that it is intended to reflect the parties' intent that the FSM and RMI should receive Stafford Act assistance on the same terms as states, not that the FSM and RMI are part of the United States for purposes of domestic laws.

[5] We also have considered whether the presumption against extraterritoriality would apply. *See EEOC v. Arabian Am. Oil Co.*, 499 U.S. 244, 248 (1991). We believe it would apply with less force than in other contexts because the presumption, at least in part, is intended "to protect against unintended clashes between our laws and those of other nations which could result in international discord." *Foley Bros., Inc. v. Filardo*, 336 U.S. 281, 248 (1949). It is unlikely that the extraterritorial application of the alienage restriction would conflict with the law of another country because the restriction applies only to eligibility for benefits under United States law. Nonetheless, the presumption is not wholly irrelevant because the statutory purposes of title IV—eliminating an incentive for immigration and discouraging aliens within the United States from relying on federal benefits—would not be served by the extraterritorial application of the alienage restriction. These purposes are not exportable, as they concern circumstances in the United States. *See Smith v. United States*, 507 U.S. 197, 204 n.5 (1993) ("the presumption is rooted in a number of considerations, not the least of which is the common sense notion that Congress generally legislates with domestic concerns in mind"). Ultimately, however, the question of extraterritoriality is one of statutory construction and, for the reasons we discuss below, we believe Congress did not intend to apply the alienage restriction extraterritorially.

RMI are not within the United States, the PRWORA's restrictions are not applicable in these countries.

Title IV addresses the domestic issues of "welfare and immigration." *See* 8 U.S.C. § 1601. In the introductory section, entitled "Statements of national policy concerning welfare and immigration," Congress set forth the statutory purposes for title IV. These purposes include ensuring that "aliens *within the Nation's borders* not depend on public resources to meet their needs," and that "the availability of public benefits not constitute an incentive for immigration *to the United States*," 8 U.S.C. § 1601(2)(A), (B) (emphases added).

This explicit concern with aliens already in the United States and aliens who might immigrate to the United States is also reflected in the legislative history of title IV. In reference to the alienage restriction, the relevant House, Senate, and conference reports discuss only aliens in the United States and potential immigrants. *See* H.R. Rep. No. 104-651, at 1442, 1443 (1996) ("It is the intent of the [House] Committee [on the Budget] that individuals who are *illegally present in the U.S. or here* for a temporary purpose such as to attend school should not receive public welfare benefits.") (emphasis added); H.R. Rep. No. 104-430, at 463 (1995) (Conf. Rep.) (determining that "[a]ny individual who is not *lawfully present in the U.S.* is ineligible for any Federal benefit" other than specified narrow exceptions) (emphasis added); Staff of S. Comm. on the Budget, 104th Cong., Personal Responsibility, Work Opportunity, and Medicaid Restructuring Act of 1996, at 215, 229 (Comm. Print 1995) ("It is the intent of the [Senate] Committee [on the Budget] that individuals who are *illegally present in the U.S. or here* for a temporary purpose such as to attend school should not receive public welfare benefits"; limiting eligibility "for public benefits will reduce the incentive for aliens to illegally *enter and remain in the U.S.*") (emphases added). Numerous statements by members of Congress reflect concern with the receipt of federal benefits by aliens inside the United States. *See, e.g.*, 142 Cong. Rec. 17,605 (1996) (statement of Rep. Lofgren) (expressing concern about long-term legal immigrants in United States not receiving nursing home coverage); *id.* at 17,606 (statement of Rep. Torres) (expressing concern about ineligibility of long-time legal immigrants in United States for benefits); *id.* at 17,609 (statement of Rep. Ensign) (stating that welfare benefits should be reserved for United States citizens; immigrants on welfare should be deported); *id.* at 17,923 (statement of Sen. Moynihan) (noting that Act would cut off income for severely disabled legal immigrants in this country); *id.* at 17,941 (statement of Sen. D'Amato) ("There are those people who . . . sign up to bring elderly people in[to the United States] and say they are going to be responsible for them, and [then] they put them right on welfare"). We are aware of no statements referring to the receipt of federal benefits by aliens abroad.

Thus, the stated purposes and the legislative history of title IV point firmly to the conclusion that Congress did not intend the alienage restriction to apply extraterritorially.

A counterargument could be made based on two provisions of the PRWORA, *see* 8 U.S.C. §§ 1611(b)(2), 1643(c) (Supp. V 1999), and three subsequent amendments, *see id*. §§ 1611(b)(3), 1611(c)(2)(C), 1643(b). Under this argument, these five provisions protect the receipt of benefits extraterritorially, and thereby suggest that, as a general matter, the alienage restriction *does* apply extraterritorially because if it did not, it would have been unnecessary for Congress to carve out the exceptions. A close examination of these provisions, however, undermines the argument that the provisions reflect the view that the PRWORA applies extraterritorially.

Section 1643(c), one of the two relevant provisions in the statute as originally passed, provides that the alienage restriction "does not apply to any Federal, State, or local government program, assistance, or benefits provided to an alien under any program of foreign assistance as determined by the Secretary of State in consultation with the Attorney General." If "foreign assistance" refers to assistance given to non-U.S. citizens in foreign countries, then arguably this provision suggests that Congress intended the alienage restriction to apply to the receipt of federal public benefits abroad other than approved programs of foreign assistance. Yet, the phrase "foreign assistance" in section 1643(c) might, alternatively, be understood to refer only to such assistance actually provided in the United States. In our view, section 1643(c) is best read as limited to these programs.

First, it is important to note that certain "foreign assistance" is provided within the United States. For example, under section 605 of the Foreign Relations Authorization Act, Fiscal Years 1986 and 1987, Pub. L. No. 99-93, 99 Stat. 405, 440 (codified at 22 U.S.C. § 4704 (1994)), the federal government administers and funds scholarship programs that permit students in developing countries to study in the United States.[6] The text of section 1643(c), moreover, appears to contemplate that foreign assistance will encompass assistance provided in the United States because Congress included state and local government programs of foreign assistance in section 1643(c). It seems unlikely that Congress sought to regulate the provision of overseas assistance by state and local governments. Indeed, because the provision of assistance beyond our borders is generally the province of the federal government, inclusion of state and local governments in this provision suggests that Congress contemplated that it would, at a minimum, have domestic application.

---

[6] We do not decide whether this or other similar programs of foreign aid constitute federal benefits within the meaning of the PRWORA. We merely note that certain foreign aid is provided within the United States.

Having established that section 1643(c) could encompass foreign assistance both abroad and in the United States, we must determine whether it encompasses *only* assistance in the United States. An analysis of the text and the legislative history of section 1643(c) makes clear that the better reading of the provision is that it refers only to foreign assistance provided within the United States.

Section 1643(c) requires a determination "by the Secretary of State *in consultation with the Attorney General*" (emphasis added). If section 1643(c) were intended to cover the provision of foreign assistance abroad, it seems unlikely that Congress would have seen an appropriate role for the Attorney General in determining whether to continue aid to a foreign country. Providing assistance abroad is generally the bailiwick of the Secretary of State. *See* Exec. Order No. 12163, 3 C.F.R. § 435 (1980) (generally delegating to the Secretary of State "functions conferred upon the President by . . . the Foreign Assistance Act of 1961"); *see also, e.g.*, 22 U.S.C. § 2151(b) ("Under the policy guidance of the Secretary of State, the Director of the United States International Development Cooperation Agency should have the responsibility for coordinating all United States development-related activities."). Immigration, in contrast, is generally the bailiwick of the Attorney General. *See* Reorganization Plan No. V of 1940, 5 U.S.C. app. 1, § 1 ("The Immigration and Naturalization Service of the Department of Labor . . . and its functions are transferred to the Department of Justice and shall be administered under the direction and supervision of the Attorney General. . . . In the event of disagreement between the head of any department or agency and the Attorney General concerning the interpretation or application of any law pertaining to immigration, naturalization, or nationality, final determination shall be made by the Attorney General."); *see also, e.g.*, 8 U.S.C. § 1103(a)(1) (Supp. V 1999) ("The Attorney General shall be charged with the administration and enforcement of the [Immigration and Nationality Act] and all other laws relating to the immigration and naturalization of aliens, except insofar as this chapter or such laws relate to the powers, functions, and duties conferred upon the President, the Secretary of State, the officers of the Department of State, or diplomatic or consular officers."). If section 1643(c) refers only to assistance provided within the United States, the role of the Attorney General makes sense: she could help the Secretary of State determine whether a particular program would serve or hinder the immigration policies set forth in title IV.

Additionally, the legislative history of section 1643(c) simply does not support the conclusion that Congress was referring to the provision of foreign aid outside of the United States. If such aid was the focus of Congress's attention, surely Congress would have debated the merits of terminating, subject to reinstatement by the Secretary of State, all foreign assistance that would be considered a federal public benefit. Instead, there is simply a statement in the Conference Report that "[t]his title does not address alien eligibility for . . . any program of foreign assistance." H.R. Rep. No. 104-725, at 391 (1996). The precise meaning of this

legislative history is unclear because the text of section 1643(c) *does* address alien eligibility for a program of foreign assistance. The statement in the Report would suggest that Congress was referring only to alien eligibility for foreign assistance abroad and not for foreign assistance within the United States. In this way, if the alienage restriction does not apply extraterritorially, the Report correctly describes section 1643(c): the provision does not address alien eligibility for foreign assistance abroad.

Finally, the reading advanced here is most consistent with the purposes of title IV. Furnishing foreign assistance abroad is unlikely to undermine self-sufficiency in the United States or to create an incentive to immigrate. For all these reasons, we believe section 1643(c) does not refer to the provision of foreign assistance abroad and therefore the provision does not reflect a congressional intent to legislate extraterritorially.

The second provision in the PRWORA as originally enacted that might be read to suggest extraterritorial effect is found in 8 U.S.C. § 1611(b)(2). In this subsection, Congress specified that the alienage restriction should not trump an international agreement or the statutory provisions governing payment of Old Age, Survivors and Disability Insurance ("OASDI") benefits to aliens abroad. Pursuant to the OASDI program, the President may enter into an international agreement with a foreign country to establish a system for determining an individual's entitlement to, and the amount of, OASDI benefits based on the time the individual spent in the United States and the other country. *See* 42 U.S.C. § 433(a) (1994). Additionally, an alien abroad is eligible for OASDI benefits, subject to certain restrictions set forth in 42 U.S.C. § 402(t) (1994) (for example, non-U.S. citizens residing outside of the United States for longer than six months are ineligible for benefits). In title IV, Congress specified the interaction between the alienage restriction and the OASDI program, providing that the alienage restriction "shall not apply . . . to any benefit if nonpayment of such benefit would contravene an international agreement described in [42 U.S.C. § 433], [or] to any benefit if nonpayment would be contrary to . . . [42 U.S.C. § 402(t)]." 8 U.S.C. § 1611(b)(2). This provision may refer in some respects to the provision of federal benefits abroad, and thus would seem to contemplate some extraterritorial application of the alienage restriction. Nonetheless, it appears that the provision is principally intended to address benefits that are, at least in large part, earned within the United States. And thus, without clarification by Congress, these benefits might have fallen within the ambit of the PRWORA because the potential to earn such benefits could create an incentive for immigration to the United States. In this light, it seems most reasonable to understand section 1611(b)(2) as a clarification that aliens should continue to receive the benefits as specified in international agreements and 42 U.S.C. § 402(t). Congress may have done so, at least in part, to ensure that it was not putting the United States in breach of an international agreement. In any event, because this is the sole provision in the

original act—an act with an exclusively domestic focus—that clearly refers to the provision of federal benefits outside of the United States, it is insufficient, in our view, to outweigh the substantial evidence in the original act indicating that the alienage restriction does not apply extraterritorially.

After the 104th Congress enacted the PRWORA in 1996, the 105th Congress added three provisions to title IV that refer to the receipt of federal benefits abroad. In each case, however, Congress specified that the provision was simply a "clarification" that the alienage restriction does not apply to the receipt of federal benefits abroad. These amendments were not a "carve out" to the extraterritorial application of the alienage restriction, but, rather, are best understood to have removed any doubt that may otherwise have existed regarding the inapplicability of the Act to the programs at issue. The first two amendments were adopted in 1997, when, as part of the Balanced Budget Act of 1997, Congress added two additional exceptions to the alienage restriction in title IV. *See* Pub. L. No. 105-33, §§ 5561, 5574, 111 Stat. 251, 638, 642 (codified at 8 U.S.C. § 1611(b)(4);[7] 8 U.S.C. § 1643(b)[8]). The House Report accompanying section 1611(b)(4) states that "[t]h[is] provision[] *clarif[ies]* that, despite general restrictions on Federal benefits for 'non-qualified aliens,' certain benefits—specifically . . . Railroad Retirement and Unemployment Insurance—are to remain available to those who earned them through work." H.R. Rep. No. 105-78, at 94 (1997) (emphasis added). Similarly, in the House Report, the only report that mentions the exception in section 1643(b), the Committee on Ways and Means explained that

> [t]his provision *clarifies* that in administering all provisions of Title IV, and especially Sections 401 and 411 relating to benefits for non-qualified aliens, restrictions on public benefits do not apply to earned benefits from work by noncitizens outside the U.S. or by noncitizens who have since left this country and are collecting veteran, pension or other benefits based on their prior work in the U.S.

H.R. Rep. No. 105-78, at 101 (emphasis added).

---

[7] "[The alienage restriction] shall not apply to any benefit payable under the Railroad Retirement Act of 1974 [45 U.S.C. §§ 231 *et seq*.] or the Railroad Unemployment Insurance Act [45 U.S.C. §§ 351 *et seq*.] to an alien who is lawfully present in the United States as determined by the Attorney General or to an alien residing outside of the United States."

[8] "Notwithstanding any other provision of this title, the limitations on eligibility for benefits under this title shall not apply to eligibility for benefits of aliens who are not residing, or present, in the United States with respect to—

> "(1) wages, pensions, annuities, and other earned payments to which an alien is entitled resulting from employment by, or on behalf of, a Federal, State, or local government agency . . . ; or

> "(2) benefits under laws administered by the Secretary of Veterans Affairs."

The third post-PRWORA change was adopted in 1998, when Congress again amended title IV. This time Congress stated even more explicitly its understanding that the original Act did not apply extraterritorially and that it was not attempting to alter the solely domestic application of the restriction. In the Noncitizen Benefit Clarification and Other Technical Amendments Act of 1998, Congress determined that the limitation on aliens receiving professional licenses should not apply to "the issuance of a professional license to, or the renewal of a professional license by, a foreign national *not physically present in the United States*." Pub. L. No. 105-306, § 5(a)(3), 112 Stat. 2926, 2927 (codified at 8 U.S.C. § 1611(c)(2)(C)) (emphasis added).[9] The legislative history of this amendment indicates that Congress understood the PRWORA's alienage restriction as applying only domestically. The House Report states that

> [t]his provision should not be taken to alter the original intent of Congress that *the provisions of the 1996 welfare reform law apply only to citizens and non-citizens physically present in the United States*. Despite this intent, several professional societies have complained that States are misapplying the 1996 law by restricting access by foreign nationals to professional licenses in the United States. Thus this provision is designed to clear up any confusion on the part of States, without altering the general intent of the welfare reform law and its application solely to individuals physically present in the United States.

H.R. Rep. No. 105-735, pt. 1, at 11 (1998) (emphasis added). This statement makes clear that the 1998 amendment should not be read to create an exception to an otherwise extraterritorial application of the alienage restriction.

The fact that a subsequent Congress added three provisions referring to federal benefits abroad does not alter our conclusion that the alienage restriction does not apply extraterritorially because Congress noted, when enacting each amendment, that the amendment was simply a clarification that the restriction does not apply outside of the United States.

---

[9] In 1997 Congress amended section 1611(c)(2)(A), clarifying that citizens of the FSM and RMI working in the United States on a contract, or who need professional or commercial licenses, are not subject to the alienage restriction. *See* Pub. L. No. 105-33, § 5565, 111 Stat. at 639 (codified at 8 U.S.C. § 1611(c)(2)(A)). This amendment does not bear on the question of extraterritoriality because the amendment addresses the applicability of the alienage restriction in the United States, and not in the FSM or the RMI. *See* H.R. Rep. No. 105-78, at 97 (1997) ("this provision clarifies that, in keeping with the[] compacts, residents of the freely associated states may enter the U.S. and pursue work by qualifying for contracts and professional and commercial licenses that are otherwise restricted to 'non-qualified aliens.'").

### III. Conclusion

In sum, we conclude that Congress did not intend the alienage restriction in title IV of the PRWORA to apply extraterritorially.[10] For this reason, FEMA's provision of Stafford Act assistance in the FSM and RMI would not violate the PRWORA.

RANDOLPH D. MOSS
*Assistant Attorney General*
*Office of Legal Counsel*

---

[10] To the extent any uncertainty endures with respect to our determination that the alienage restriction does not apply extraterritorially, we note that this could be resolved by the Secretary of State determining that Stafford Act assistance in the FSM and RMI is a program of foreign assistance pursuant to 8 U.S.C. § 1643(c). Nonetheless, we believe the better reading of the PRWORA is that the alienage restriction does not apply extraterritorially.